# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CHRISTOPHER WEST, | : | Case No. 3:18-cv-00245 |
| Plaintiff, | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

**I.   Introduction**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a disability, among other eligibility requirements. A disability in this context refers to "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Plaintiff Christopher West applied for Disability Insurance Benefits, asserting he was under a disability starting on February 23, 2012. His applications and evidence worked their way through preliminary denials leading up to review by Administrative Law Judge (ALJ) Elizabeth A. Motta. Finding Plaintiff not disabled, ALJ Motta denied his application for

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

benefits. (Doc. #8, *PageID* #s 39-56).

Plaintiff brings the present case contending (in part) that ALJ Motta incorrectly weighed medical evidence, including the opinions provided by his treating psychologist Paul Deardorff, Ph.D. Plaintiff seeks a remand of this case preferably for payment of benefits but alternatively for further proceedings. The Commissioner finds no error in the ALJ's decision and asks the Court to affirm rather than remand.

## II.  Background

Plaintiff was thirty years old on his asserted disability onset date. He has at least a high-school education. He worked in the past as a District Manager responsible for managing several dozen newspaper-delivery employees.

Plaintiff testified before ALJ Motta that he injured his back while working in 2011. Despite several surgeries, he remains in low-back pain with leg numbness. His pain is sharp and goes from his lower back through his groin, legs, feet, and toes. Because of this, his upper back tightens, causing him additional pain. He explained to ALJ Motta that his back "went out" five times before he stopped working. "I could not even put clothes on…," he said, "or even take a shower or anything for at least a week or so after every time it went out." (Doc. #8, *PageID* #67). To treat his pain, he takes Ibuprofen 800, Flexeril, and Omeprazole. The most he can comfortably lift and carry is ten pounds. Any more weight feels like it is crushing him. *Id*. at 77. He cannot walk without extreme back pain; he needs to alternate between sitting and standing constantly throughout the day. *Id*.

Plaintiff has mental-health difficulties. Twice a month, he saw psychologist Dr. Deardorff for counseling. Each month, he also saw psychiatrist Ramakrishna Gollamudi,

M.D., who prescribed Xanax, Zoloft, and Wellbutrin. *Id*. at 69. This medication took a "tiny bit of the edge off" Plaintiff's symptoms. *Id*. at 74. But his medication caused him to become drowsy, dizzy, tired, a little nauseated. *Id*. at 76.

A few times a week, Plaintiff's psychiatric symptoms emerge in a singular way. He explained, "I get stuck in what I call loops where I will pace back and forth for half an hour to sometimes hours[,] repeating the same sentence over and over again…." *Id*. He also has described his "blackouts" as "where I might get into the car a drive for 15 minutes and all of a sudden not know why I'm in the car or where I'm going. I forget things. I put things in the wrong places all the time." *Id*.

Plaintiff testified that he had "significantly worse" psychological problems at the time of the ALJ's hearing (in July 2014) than he'd had when he stopped working in 2012. *Id*. at 71. He told the ALJ, "I have depression, extreme anxiety to the point of where I regularly throw up and have non-stop diarrhea. I … will fall over. I've become very angry and violent." *Id*. He had never been arrested, but he added, "I probably came close the other day when I almost took a machete into the DMV…." *Id*. at 72. He cannot leave his house "without … just constantly thinking about murdering people." *Id*. He once attempted to commit suicide. Whether or not he sleeps well depends on his level of anger and anxiety. A couple times a month, he will not sleep for days. Other times he will sleep all day. *Id*. at 75.

If Plaintiff is in a large group of people, he gets very anxious and very paranoid. He carries weapons wherever he goes. He added:

My car's literally full of weapons right now. I immediately start thinking about

3

torturing, raping, and murdering people, and I can't not do that now.  I have so many things going through my head that I can't focus, which will sometimes lead me to kind of start falling over….  [T]here's so much noise going on in my head that that drives the anger and then the pain, obviously, adds to that.

*Id*. at 78.

During the day, Plaintiff cooks very basic stuff, not a full meal.  He does the laundry if his wife carries it for him.  He does very little yardwork.  His wife mows the lawn a lot.  Although he sometimes mows the lawn, he needs to use back braces and takes "a bunch of medication, Icy Hot, and stuff to get through it."  *Id*. at 72.  He goes to the store with his wife but goes as early as possible to avoid people.  *Id*. at 75.  He tries "not to leave the house as much as possible."  *Id*. at 73.  He does not have friends due to his psychological difficulties.  He does not talk with his family and sees them once a year.  As far as hobbies, he has a computer but only uses it to check the news.  He does not have a social media account.  He plays guitar, drums, base, and keyboard but can do so only for fifteen minutes because he has difficulty focusing.  *Id*. at 75-76.  He had not played in a band for seven or eight years.  He reads but it is difficult for him to keep focused, so he flits from one thing to the next.

Plaintiff's medical records reveal that in November 2013, psychologist Nicole Leisgang, Psy. D., examined him.  She observed that he was cooperative.  He was clean and neat in appearance.  He appeared nervous by displaying noticeable facial fidgeting.  He also fidgeted with his hands, avoided eye contact, and laughed nervously at times.  Dr. Leisgang noticed that "[h]e also spoke in a somewhat monotone voice and was generally sullen….  He did not appear to exaggerate or minimize his difficulties.  He was adequately motivated."

4

*Id*. at 402. Dr. Leisgang reported that Plaintiff "responded honestly and candidly on the first half of the MMPI-2 [Minnesota Multiphasic Personality Inventory]…." *Id*. at 403. Despite this reference to the first half of the MMPI, Dr. Leisgang accepted the results of this personality test as "valid and suggestive of anxious and depressed mood." *Id*. at 404; *see* 403 ("His responses were suggestive of anxious and depressed mood."). Dr. Leisgang further wrote, "In order to assess his effort, the Rey-15 Item Memory test was administered. [He] reproduced 15 out of 15 items. His performance on this measure was not suggestive of an intentional attempt to exaggerate memory deficits." *Id*. at 403.

Dr. Leisgang diagnosed Plaintiff with generalized anxiety disorder and depressive disorder NOS and opined that these conditions stemmed from his workplace injury. *Id*. at 404-05. Dr. Leisgang recommended counseling and psychiatric consultation, with a goal of increasing his social participation. *Id.*

Beginning in December 2013, Plaintiff began counseling with Rebecca Sammartino-Marple, MSW, LSW. *Id*. at 929. Ms. Sammartino-Marple diagnosed Plaintiff with depressive disorder NOS. She found that Plaintiff's "symptoms are current barriers to returning to work. He has verbalized distress regarding his poor sleep, anger, racing thoughts." *Id.* Plaintiff's twice monthly counseling with Ms. Sammartino-Marple continued for nearly one year. At its conclusion in November 2014, she noted that Plaintiff confirmed his ongoing violent thoughts, nightmares, racing thoughts, social isolation, poor attention and concentration, and poor sleep. She noted that he was "not adequately responding to psychotherapy at this time." *Id*. at 888.

In November 2014, psychologist Paul Deardorff, Ph.D., evaluated Plaintiff upon

5

referral from Ms. Sammartino-Marple. He was, at that time, receiving workers' compensation due to his depression. *Id*. at 135. Plaintiff told Dr. Deardorff, in part, "'I pace around the house … I say the same thing over and over … I get stuck.'" *Id*. at 336. Plaintiff stated that he was easily angered and had violent, racist, and hateful thoughts. *Id*. at 335-36. He said, "basically I hate everyone …." *Id*. at 336. Dr. Deardorff observed the following:

> [Plaintiff] was a cooperative man with whom rapport was adequately established. He was clean and neat in appearance. His grooming and hygiene [were] good. He appeared to be anxious as he maintained minimal eye contact and displayed slight but noticeable facial flushing. He displayed no other autonomic or motoric indications of anxiety. His thought processes were clear and logical. His complaints of pain could be indicative of a somatic focus. His comments were suggestive of obsessive thoughts and compulsive behaviors but he displayed no other abnormalities of mental content. His clinical presentation did not suggest that he appeared to exaggerate or minimize his difficulties. He was adequately motivated.

*Id*. at 394. As far as test results, Dr. Deardorff noted that Plaintiff's MMPI-2 profile was "not valid as test data is very strongly indicative of the over-endorsement of emotional difficulty." *Id*. at 338. Dr. Deardorff diagnosed Plaintiff with depression and anxiety with obsessive-compulsive traits. He recommended continued counseling, psychiatric care, vocational rehabilitation, and increased social interaction. *Id.*

In January 2015, Plaintiff began therapy sessions with Dr. Deardorff. *Id*. at 704. By August 2015, Plaintiff had seen Dr. Deardorff for psychotherapy on seven occasions. Dr. Deardorff noted that Plaintiff's pain leads to irritability. Plaintiff appeared to recognize that he needs others in his life in order to cope with his depression more effectively. *Id*. at 392.

In July 2015, Dr. Deardorff completed a form for the Ohio Bureau of Workers' Compensation. He reported that Plaintiff had decreased violent thoughts but continued to experience feelings of hopelessness with some suicidal ideation. He remained irritable and had difficulty in appropriately interacting with others. *Id.* at 644. He engaged in social isolation, had limited energy, poor frustration tolerance, and preoccupation with pain. *Id.* Dr. Deardorff believed that Plaintiff's irritability, anxiety, and problematic thoughts would prevent him from coping with vocational rehabilitation. *Id.*

On January 27, 2016, Dr. Deardorff reported that he had seen Plaintiff three times in the second half of 2015. *Id.* at 1851. Dr. Deardorff noted that Plaintiff was compliant in his treatment and never missed appointments. *Id.* He reported that Plaintiff discussed his marital problems in his therapy sessions, as he had back in 2015. *Id.* Dr. Deardorff observed that Plaintiff generally displayed a rather flat affect and spoke in an almost monotone. He wrote that Plaintiff "can be difficult to relate to. Again, prior to the injury, he enjoyed his job, interacted well with others, and functioned adequately…." *Id.* at 1851.

Also on January 27, 2016, Dr. Deardorff wrote a letter in response to Plaintiff's call to jury duty. Dr. Deardorff opined that if Plaintiff served as a juror, "what he might be exposed to would very likely result in increased anger and more intense depression. He is somewhat socially isolated and does not relate well to others. He would have considerable difficulty working in a constructive manner with other jurors to reach a decision…." *Id.* at 1870. Dr. Deardorff asked that Plaintiff be released from jury duty because Dr. Deardorff believed "with a reasonably degree of psychological certainty that serving would be detrimental to his emotional health." *Id.*

7

Later in 2016, Dr. Deardorff reported seeing Plaintiff six times from February through June. *Id*. at 1872. He again noted that Plaintiff was compliant with his treatment and discussed his marital problems during their sessions. *Id.* Dr. Deardorff explained that Plaintiff's limited functioning interfered with his marriage: "This remained a significant source of tension, contributing to his depressive symptomatology and irritability." *Id*. at 1872.

In February 2017, Dr. Deardorff completed a form titled, "Attending Physican's [sic] Statement of Disability." *Id*. at 1867. He reported that Plaintiff was cooperative. He had halted speech, logical thought processes, fair insight, and retarded psychomotor activity. Dr. Deardorff checked boxes indicating that Plaintiff had "no ability" or "minimal ability" to perform many work-related functions—for instance, relating to others, dealing with the public, interacting with supervisors, dealing with work stressed, behaving in an emotionally stable manner, and understanding, remembering, and carrying out complex job instructions. *Id*. at 1868.

On February 16, 2017, Dr. Deardorff wrote a letter describing in detail Plaintiff's mental-health status. He reported that testing placed Plaintiff in the severe range of depression. He described Plaintiff as unable to work:

> [Plaintiff] is an emotionally fragile individual who is having considerable difficulty coping with his pain, inability to work, and his significant depressive symptomatology. It is unlikely that he would respond appropriately to supervisory feedback or even the normal kidding which happens in the workplace. As such, it is my opinion with a reasonable degree of psychological certainty that [he] is incapable of functioning adequately in a competitive work environment.

*Id*. at 1866.

### III.     Standard of Review and ALJ Motta's Decision

Review of ALJ Motta's decision considers whether she applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.), *Report & Recommendations adopted*, 2018 WL 3549787, at *1 (S.D. Ohio 2018) (Rice, D.J.).

The ALJ reviewed the evidence and evaluated Plaintiff's disability status under a each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.[2] Her more pertinent findings began at steps two and three where she found that Plaintiff had severe impairments—lumbar degenerative disc disease, depressive disorder, history of polysubstance abuse—and that his impairments did not automatically qualify him for benefits. (Doc. #6, *PageID* #47-54).

At step four, the ALJ concluded that the most Plaintiff could do (his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of "light work" with many limitations. She found, for example:

> The claimant can stand/walk as much as four hours a day combined total during an eight-hour workday. He can sit up to six hours in an eight-hour workday…. [He] is limited to performing simple, repetitive tasks involving low-stress duties (i.e., no strict production quotas or fast pace and only routine work with few

---
[2] Further citations to social security regulations will identify the pertinent Disability Insurance Benefits regulation with full knowledge of the corresponding Supplemental Security Income regulation.

changes in work setting). [He] should have only occasional contact with the public, co-workers, and supervisors, including no teamwork or over-the shoulder supervision.

*Id*. at 55.

The ALJ concluded at step five that there were many full-time jobs Plaintiff could perform. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits or Supplemental Security Income.

**IV.     Discussion**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the

physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

Plaintiff contends that the ALJ "did not in any way come close to fulfilling her obligation of giving good reasons for her unwillingness to accept Dr. Deardorff's opinions." (Doc. #9, *PageID* #1951 (internal quotations omitted)). The Commissioner counters, "the ALJ provided numerous good reasons for not giving Dr. Deardorff's opinions' controlling weight and reasonably weighed Dr. Deardorff's opinion in accordance with the regulations."

The ALJ decided not to place controlling or deferential weight on Dr. Deardorff's opinion because it is not well supported by the medical evidence and is inconsistent with other substantial medical evidence. (Doc. #8, *PageID* #52). The ALJ then explained that Dr. Deardorff "initially evaluated Plaintiff for purposes of the Bureau of Workers' Compensation claim and said that he was not establishing a treating relationship, yet [Plaintiff] continued to see Dr. Deardorff, who continued to request sessions, which could indicate some conflict with regard to economic gain on the part of Dr. Deardorff." *Id*. (citing Exhibit 3F, page 8; *PageID* #398). This explanation is unreasonable for several

11

reasons. First, the ALJ incorrectly thought Dr. Deardorff's evaluation of Plaintiff on November 5, 2014 was "for the purposes of his BWC claim…." *Id*. at 52. But Dr. Deardorff explained in his report, "Christopher West was evaluated at the request of his therapist, Ms. Sammartino, who expressed concern that his symptomatology has become more severe …." *Id*. at 395. Second, the fact that Dr. Deardorff explained to Plaintiff that he was not providing treatment or establishing a doctor-patient relationship is consistent with the purpose of the one-time evaluation Dr. Deardorff was performing. Third, there is nothing in the evaluation report or Dr. Deardorff's later treatment of Plaintiff (starting in February 2015) that remotely suggests he was motivated in any way by a desire for financial gain rather than providing the best possible treatment for Plaintiff. Fourth, the fact that Dr. Deardorff provided information about Plaintiff to the BWC on later occasions is not reasonably probative of any conflict of interest. It shows a psychologist helping a patient obtain much-needed treatment in an age of ever-escalating medical costs.

The ALJ next relied on the absence of objective medical evidence supporting Dr. Deardorff's opinions. This was error.

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment ... consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.... In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices [*sic*] in order to obtain objective clinical manifestations of medical illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (citing *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987) (other citation omitted)).

The ALJ explained that Dr. Deardorff's treatment "notes generally show only some symptoms of depression and anxiety, psychomotor retardation, halted speech, and no more than moderately impaired attention, concentration, and memory…." *Id*. at 52. The ALJ, however, ignored other signs and symptoms that Dr. Deardorff documented. In July 2015, Dr. Deardorff recognized that Plaintiff expressed hopelessness with some suicidal ideation, irritability. He was socially isolated and had limited energy, poor frustration tolerance, and preoccupation with pain. *Id*. at 644. Dr. Deardorff opined that Plaintiff's irritability, anxiety, and problematic thoughts would prevent him from coping with vocational rehabilitation. *Id*. In January 2016, Dr. Deardorff described Plaintiff as having a rather flat affect and speaking in almost a monotone. *Id*. at 1851. He also noted that Plaintiff "can be difficult to relate to." *Id*. Plaintiff's problems emerged, as Dr. Deardorff had noted in the past, after he injured himself at work. Dr. Deardorff's letter about Plaintiff and jury duty again reports his many symptoms. *Id*. at 1870. In contrast to the ALJ's decision, this evidence strongly supports Dr. Deardorff's opinions.

The ALJ also relied on what she thought were "relatively normal" findings. *Id*. at 52. But such findings on their face do not to conflict with Dr. Deardorff's opinions—a person can surely have work-preclusive depression and anxiety while likewise having some strengths like good hygiene; a cooperative attitude in treatment; logical and coherent thought processes; moderately impaired attention, concentration, and memory; adequate

receptive language skills; fair insight; no difficulty with basic math calculations; "and overall average to bright-average intelligence." *Id*. at 52. Also, Dr. Deardorff knew Plaintiff had these strengths yet still concluded that Plaintiff's depression and anxiety would be work preclusive. To this extent, the ALJ substituted her own lay interpretation of the same set of data that Dr. Deardorff analyzed to reach his conclusions—another error. *See Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." (citations omitted)); *cf. Devoll v. Comm'r of Soc. Sec.*, No. 95-1166, 1996 WL 560424, at *4 (6th Cir. 1996) ("when a claimant presents evidence that she suffers from a mental impairment, the ALJ should make every attempt to complete the record by retaining expert assistance under § 404.1520a.").

The ALJ erred similarly by finding Dr. Deardorff's opinions out of proportion to Dr. Gollamudi's treatment notes. (Doc. #8, *PageID* #52). The ALJ, however, overlooked or ignored that Dr. Gollamudi diagnosed Plaintiff with major depression, recurrent, and repeatedly characterized his mood as depressed and anxious. *E.g., PageID* #s 1712, 1714, 1716, 1718, 1720, 1722. In August 2014, Plaintiff was irritable, his affect was constricted, and he was resistant, impulsive, and restless. He was diagnosed with major depressive disorder (MDD) recurrent with psychosis. *Id*. at 1708. Such evidence supports Dr. Deardorff's opinions.

The ALJ, moreover, did not recognize that Plaintiff saw Dr. Gollamudi for prescription management. Such appointments typically a much shorter time than counseling

14

sessions with psychologists. Plaintiff reported, to his former attorney, that his appointments with Dr. Gollamudi lasted about five minutes per month with Dr. Gollamudi asking only three questions: "1) How are you feeling? 2) Are you sleeping?; and 3) How is your mood." *Id*. at 307. It is not surprising that Dr. Gollamudi's records lacked detailed information about Plaintiff's ongoing psychiatric problems. And it was not reasonable for the ALJ to view Dr. Deardorff's opinions as out of proportion to the records of Dr. Gollamudi's cursory meetings with Plaintiff.

The Commissioner contends that the ALJ reasonably discounted Dr. Deardorff's opinion because it was based upon Plaintiff's non-credible reports of violent fantasies and outbursts. "Because the ALJ reasonably found those reports non-credible, it was also reasonable to conclude that Dr. Deardorff's opinion was not supported by the record." (Doc. #11, *PageID* #1976).

In support of this argument, the Commissioner cites to *PageID* #s 45 and 49. But the ALJ did not specifically find on either page that Plaintiff's reports of violent fantasies and outburst as not credible. In addition, a review of these pages reveals that the ALJ erred as a matter of law by finding Plaintiff's descriptions of his symptoms "are not entirely consistent with the medical evidence," *id*. at 45, or "not fully supported by the record," *id*. at 49. The Regulations promise that when considering the intensity and persistence of a claimant's symptoms, ALJs will consider all the available evidence. "We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory evidence and other evidence to decide how your symptoms affect your ability to work." 20

15

C.F.R. §404.1529(a). Nothing in this, or elsewhere in the Regulations, permits an ALJ to require the evidence to be "entirely consistent" or "fully support" the claimant's statements about his symptoms.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## V. <u>Remand</u>

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

16

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether he was under a benefits-qualifying disability, including, at a minimum, a reassessment of his residual functional capacity and a re-consideration of the evidence at steps three, four, and five of the sequential evaluation.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability decision on December 27, 2017 be vacated;

2. This matter be remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations and any Order adopting this Report and Recommendations; and

3. The case be terminated on the Court's docket.

September 4, 2019                                    *s/Sharon L. Ovington*
                                                                      Sharon L. Ovington
                                                                      United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).